1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   XAVIER DMETRI NAILING,              No. CIV S-09-2475-MCE-CMK

12              Plaintiff,

13       vs.                            <u>FINDINGS AND RECOMMENDATIONS</u>

14   B.D. FOSTERER, et al.,

15              Defendants.

16   _____/

17              Plaintiff, a former prisoner proceeding pro se, brings this civil rights action

18   pursuant to 42 U.S.C. § 1983.[1]    Pending before the court is defendants' motion for summary

19   judgment (Doc. 112).

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26       [1]    Plaintiff filed this action while incarcerated but has since been released.  The case
now proceeds as a referred non-prisoner pro se action.

# I. BACKGROUND

### A.    Plaintiff's Allegations

This action proceeds on the amended complaint filed on March 2, 2010.  The following seven defendants remain in the action:  B.D. Fosterer; K.O. Holman; P. Coughlin; R. Pruitt; Stotz; A.D. Brown; and T.J. Vasquez.[2]  Plaintiff alleges generally that defendants disregarded a serious risk to his safety and that, after he had been assaulted, defendants failed to respond to his serious medical needs.

More specifically, plaintiff alleges that defendants essentially labeled plaintiff a sex offender  "by way of printing disorderly conduct; prostitution offer sex on a CDCR 128-G classification chrono."  Plaintiff claims that such chonos are "circulated to all inmates in classification or via prison mail; so that inmates can prove to one another that one is not a sex offender."  Plaintiff claims that it is well-known among inmates and prison staff that prisoners labeled as sex offenders "are attacked, stabbed, and or beaten."  Plaintiff alleges that defendants must have known that he would be attacked as a result of the chrono "because of the high rate of inmate assaults in the past at Folsom State Prison . . . ."  Plaintiff adds:

> Defendants had incorrect information in the Plaintiff central file that states Nailing is an effeminate homosexual that is incapable of defending himself from sexual harassment.   The defendants knew the Plaintiff was an obvious target for assault.  Yet put him in a dangerous (GP).

Next, plaintiff claims that "he would not be let out to eat with the rest of the Hispanics on his tier because he's black."  According to plaintiff, Lucas "changed the Plaintiff ethnicity from Hispanic to black causing further discrimination by Martin and Pruitt stating to the Plaintiff 'your ass out.'"  Plaintiff states that he was "then assaulted after defendant C. Lewis unlocked the tier gate let one of the attacker pass right by him, then the defendant pulled down the bar that unlocks all the cell waited until the Plaintiff cell was pushed open then pull down the

---

[2]   Evans, Casey, and Martin were dismissed on April 15, 2011.  Bemrick, Torruella, Cardeno, Lewis, and Lucas were dismissed on March 29, 2012.

1  bar locking the Plaintiff cell open."

2          Plaintiff next claims that he was taken to see the prison doctor, Torruella.

3  According to plaintiff, Torruella asked plaintiff one question quickly, looked him over, and said

4  "He's fine, he can go."  Plaintiff states that the next day he told Brown that he was unable to

5  open his mouth to eat.  Brown instructed plaintiff to complete a "sick call slip."  The next day,

6  according to plaintiff, he told Stotz that he could not open his mouth to eat.  Again, plaintiff was

7  instructed to complete a "sick call slip" in order to be seen by prison medical staff.   Plaintiff

8  states that, over the next two weeks, he continued to complain to defendants that he could not

9  open his mouth to eat.

10          Plaintiff outlines the following timeline of events:

11  | July 17, 2008 | Upon plaintiff's arrival in the California prison system, his ethnicity was listed as "Hispanic." |

12

13  | September 4, 2008 | Plaintiff filed an inmate grievance because he learned that his ethnicity had been changed to "Black." |

14  | September 26, 2008 | Plaintiff's grievance was granted. |

15  | October 30, 2008 | When plaintiff arrived at Folsom State Prison his ethnicity was listed as "Hispanic." |

16

17  | November 4, 2008 | Plaintiff appeared before the classification committee for placement.  Fosterer, Holman, and Coughlin were on the panel.  According to plaintiff: |

18

19          . . . All three named defendants must
agree upon any information that is placed

20  after "sex" on any 128G chrono and they
did.  This same committee also agreed to

21  send the Plaintiff to general population when
defendants should have known and upon

22  information and belief did know that by
placing any inmate on general population

23  and printing anything after "sex" on one
128G chrono that its highly likely that; that

24  inmate will be attacked. . . .

25  Plaintiff claims that the committee "used a misdemeanor to
label the Plaintiff a sex offender. . . ."  Plaintiff states

26  defendants' conduct "placed him in a category from which
there is no return."

| | | |
|---|---|---|
| January 10, 2009 | | Plaintiff obtained a copy of the 128G chrono in question. Plaintiff also claims that Pruitt came to his cell and told him that, because he is listed as "Black," he would not be allowed out of his cell to eat with the general population. Pruitt and Martin told plaintiff that the Black inmates were on lock-down and that he would bring food to plaintiff's cell. |
| January 12, 2009 | | Plaintiff filed an inmate grievance "because he know that he was not a sex offender and by classification placing disorderly conduct then stating prostitution on his 128G chrono. . . ." |
| January 26, 2009 | | Plaintiff was interviewed by Forsterer in connection with his grievance.  During this interview, plaintiff informed Forsterer that the sex offender designation was incorrect and that leaving such designation in his file created a risk of danger from other inmates.  According to plaintiff, Forsterer told him that the sex offender designation was based on three crimes for which plaintiff served time in county jail.  Plaintiff states that these crimes were misdemeanors which "can not be used against me in any way after probation is over." |
| January 29, 2009 | | Plaintiff's grievance concerning the sex offender designation based on prior misdemeanor convictions was denied. |
| February 2, 2009 | | Plaintiff was interviewed by Evans incident to a second-level review of plaintiff's grievance.  According to plaintiff, Evans "also denied it knowingly disregarding the safety of the Plaintiff." |
| February 23, 2009 | | Plaintiff states he was assaulted after Pruitt and Lewis left his cell "locked open," thereby allowing another inmate to attack plaintiff.  After the assault, plaintiff was taken to the prison infirmary where he was examined by Torruella. Plaintiff adds that he was sprayed with pepper spray by Lewis.  According to plaintiff, he informed Brown and Stotz that he cannot open his mouth to eat.  Brown and Stotz instructed plaintiff to complete a "sick call slip." |
| February 26, 2009 | | Plaintiff was interviewed by Vasquez regarding the assault. According to plaintiff, Vasquez asked whether the attack had anything to do with a sex charge to which plaintiff responded "I don't know but if it does its staff's fault for putting it on there."  Plaintiff states that Vasquez admitted: "Well we knew that Martinez was going to do something." |

///

4

| | |
|---|---|
| March 1, 2009 | Plaintiff complained of dizzy spells and swelling in his left jaw and submitted a medical request form. |
| April 16, 2009 | Plaintiff submitted another medical request form regarding his jaw. |
| April 20, 2009 | Plaintiff's jaw and head were x-rayed.  On this same day, Cardeno "did in fact discover that the Plaintiff had a fracture on the left side of his face, yet did not send the Plaintiff to get treated causing the Plaintiff to indure [sic] more pain and greater injury."  According to plaintiff, Cardeno sent the x-rays to an outside hospital for further evaluation. |
| April 23, 2009 | Plaintiff states that Bemrick (apparently a doctor at the outside hospital) "knew that the Plaintiff had previously been diagnosed with a fracture of the left jaw and on 4-23-09 issued a report that was false causing the Plaintiff to not get treated and by doing so causing the Plaintiff greater injury and pain." |

**B.    Defendants' Evidence**

Based on party and non-party declarations, as well as portions of plaintiff's prison file, defendants state that the following facts are undisputed:

1.    On November 4, 2008, plaintiff appeared before a prison classification committee consisting of Fosterer, Coughlin, and Holman.

2.    The committee is required to place an "R" suffix custody designation on classification documents for any inmate with a history of certain sex offenses, such as rape or child molestation.

3.    The committee is also required to note any sex-related offenses which fall short of the "R" suffix designation.

4.    In reviewing plaintiff's file, the committee noted separate convictions for prostitution on January 3, 1994, November 16, 1994, April 19, 1996, and January 16, 1997.

5.    Plaintiff was not assigned an "R" suffix.

6.    All of the information considered at the classification committee hearing were noted on a confidential "Form 128-G" chrono, which was placed in plaintiff's central file.

7.    Plaintiff's 128-G chrono was not disclosed to other inmates.

8.    None of the members of the classification committee had ever heard of a

5

case where an inmate was attacked because of a notation of a crime of prostitution on a confidential 128-G chrono which did not include an "R" suffix.

9.   On January 12, 2009, plaintiff filed a grievance concerning inclusion of his prostitution convictions on the 128-G classification chrono.

10.  On January 26, 2009, plaintiff was interviewed by defendant Fosterer regarding his grievance.

11.  Plaintiff never expressed any concerns for his safety as a result of information contained in his 128-G chrono, at the time of the classification committee hearing, in his grievance, or at the interview with Fosterer.

12.  On February 23, 2009, plaintiff was attacked by his cellmate and another inmate who had been let into his cell.

13.  Neither defendants Pruitt nor Vasquez were present at the time of the attack, and neither had any prior knowledge that plaintiff would be attacked.

14.  Plaintiff was seen by a prison nurse immediately after the attack.

15.  After the attack, plaintiff was transferred to administrative segregation.

16.  On February 24, 2009, plaintiff asked to see a medical staff member and was told by defendant Stotz that he is first required to complete the appropriate request form.

17.  Plaintiff completed the form and returned it to Stotz who immediately forwarded it to medical staff.

18.  Later that day, plaintiff stopped defendant Brown complaining of jaw pain.

19.  Brown instructed plaintiff to complete the appropriate form, and plaintiff responded that he already had.

20.  Plaintiff's medical request form was reviewed that same day – February 24, 2009 – and plaintiff was seen by a prison doctor the following morning.

21.  Examination revealed a superficial abrasion of plaintiff's right knee, a contusion of his left flank, and seasonal allergies.

22.  Plaintiff was prescribed medication.

23.  Neither Stotz nor Brown ignored plaintiff's requests for medical treatment or failed to notify medical staff of his request, nor was either aware of any prison grievances filed by plaintiff.

## II.  STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

1   could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433,

2   1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more

3   than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the

4   record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

5   there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).  It is

6   sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the

7   parties' differing versions of the truth at trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

8           In resolving the summary judgment motion, the court examines the pleadings,

9   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

10  any.  <u>See</u> Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, <u>see</u>

11  <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed

12  before the court must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475 U.S. at 587.

13  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

14  produce a factual predicate from which the inference may be drawn.  <u>See Richards v. Nielsen</u>

15  <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir.

16  1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for

17  the judge, not whether there is literally no evidence, but whether there is any upon which a jury

18  could properly proceed to find a verdict for the party producing it, upon whom the onus of proof

19  is imposed."  <u>Anderson</u>, 477 U.S. at 251.

20

21                              **III.  DISCUSSION**

22          In their motion for summary judgment, defendants argue: (1) plaintiff

23  cannot prevail on a due process claim arising from his classification; (2) plaintiff cannot prevail

24  on an Eighth Amendment safety claim arising from his classification as a sex offender;

25  (3) plaintiff cannot prevail on an Eighth Amendment medical needs claim arising from the

26  treatment he received following the attack; (4) plaintiff cannot prevail on an equal protection

                                        8

1  claim arising from his being listed as "Black"; (5) plaintiff cannot prevail on a retaliation claim;

2  and (6) any state law claims are barred.[3]

3       **A.**    **Due Process**

4            While defendants state that plaintiff alleges a due process claim arising from his

5  classification, which included reference to a conviction for prostitution, no such claim is raised in

6  the amended complaint.  Plaintiff confirms this in his opposition to defendants' motion by

7  stating: "This is not a classification case."  In any event, defendants are correct that plaintiff has

8  no due process right in a particular classification.  See Moody v. Daggett, 429 U.S. 78, 88 n.9

9  (1976).  Moreover, plaintiff does not allege that the prostitution conviction is invalid or that his

10  classification is otherwise incorrect with respect to the inclusion of a sex offense on his

11  classification chrono.

12       **B.**    **Eighth Amendment Claims**

13            The treatment a prisoner receives in prison and the conditions under which the

14  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

15  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

16  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

17  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

18  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

19  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

20  "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

21  801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only

22  when two requirements are met: (1) objectively, the official's act or omission must be so serious

23  such that it results in the denial of the minimal civilized measure of life's necessities; and (2)

24  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

25

26        [3]      Defendants also argue that they are entitled to qualified immunity.

1    inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

2    official must have a "sufficiently culpable mind."  See id.

3              Under these principles, prison officials have a duty to take reasonable steps to

4    protect inmates from physical abuse and otherwise provide for their safety.  See Hoptowit v. Ray,

5    682 F.2d 1237, 1250-51 (9th Cir. 1982); Farmer, 511 U.S. at 833.  Liability exists only when two

6    requirements are met:  (1) objectively, the prisoner was incarcerated under conditions presenting

7    a substantial risk of serious harm; and (2) subjectively, prison officials knew of and disregarded

8    the risk.  See Farmer, 511 U.S. at 837.  The very obviousness of the risk may suffice to establish

9    the knowledge element.  See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  Prison

10   officials are not liable, however, if evidence is presented that they lacked knowledge of a safety

11   risk.  See Farmer, 511 U.S. at 844.  The knowledge element does not require that the plaintiff

12   prove that prison officials know for a certainty that the inmate's safety is in danger, but it

13   requires proof of more than a mere suspicion of danger.  See Berg v. Kincheloe, 794 F.2d 457,

14   459 (9th Cir. 1986).  Finally, the plaintiff must show that prison officials disregarded a risk.

15   Thus, where prison officials actually knew of a substantial risk, they are not liable if they took

16   reasonable steps to respond to the risk, even if harm ultimately was not averted.  See Farmer, 511

17   U.S. at 844.

18             Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

19   injury or illness, also gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at

20   105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental

21   health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is

22   sufficiently serious if the failure to treat a prisoner's condition could result in further significant

23   injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d

24   1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

25   Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

26   is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

1    activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See

2    Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

3            The requirement of deliberate indifference is less stringent in medical needs cases

4    than in other Eighth Amendment contexts because the responsibility to provide inmates with

5    medical care does not generally conflict with competing penological concerns.  See McGuckin,

6    974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

7    decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

8    1989).  The complete denial of medical attention may constitute deliberate indifference.  See

9    Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

10   treatment, or interference with medical treatment, may also constitute deliberate indifference.

11   See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also

12   demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

13           Negligence in diagnosing or treating a medical condition does not, however, give

14   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

15   difference of opinion between the prisoner and medical providers concerning the appropriate

16   course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

17   90 F.3d 330, 332 (9th Cir. 1996).

18           1.    Safety

19           According to plaintiff, the members of the classification committee knew that an

20   attack would occur due to the reference to sex offences in his 128-G chrono and that defendants

21   allowed the attack to occur.  Defendants argue that plaintiff cannot prevail because the

22   undisputed evidence shows that: (1) the 128-G chrono was confidential and its contents were not

23   known to other inmates; (2) defendants had no knowledge that an attack would occur.  This

24   argument is persuasive, most significantly because plaintiff has not provided any evidence to

25   suggest that his 128-G chrono was not kept confidential.  Absent such evidence, plaintiff cannot

26   establish that there was any known safety risk.  Rather, the attack appears to be unrelated to

1   plaintiff's classification.

2         2.   <u>Medical Needs</u>

3         Defendants also persuasively argue that plaintiff cannot prevail on the medical

4   needs component of his Eighth Amendment claim because he was in fact provided medical

5   treatment.  Defendants' evidence shows that, immediately after the attack, he communicated his

6   complaints to prison guards who instructed plaintiff on the procedure for obtaining a medical

7   visit, namely completion of the required form.  The evidence also shows that plaintiff completed

8   the request form and was seen by a prison doctor the next day.  Plaintiff has not provided any

9   evidence to suggest that his requests for medical treatment were ignored.

10      **C.**   **Equal Protection**

11        Defendants argue that plaintiff cannot prevail on a claim that he was denied equal

12  protection because he was labeled as a "Black" on classification documents when he is in fact

13  Hispanic.  According to plaintiff, defendant Pruitt changed his classification documents to

14  indicate "Black" instead of "Hispanic" and that, as a result, he was not allowed out of his cell at

15  certain times due to a lock-down of African-American inmates.  Plaintiff alleges that, had he

16  been allowed out of his cell with the Hispanic inmates, he would not have been attacked.

17  Defendants are correct that plaintiff cannot prevail because, according to defendant Pruitt, he had

18  no involvement with plaintiff's classification and plaintiff has not provided any evidence to the

19  contrary.  While defendants acknowledge some apparent error with respect to how plaintiff's race

20  was listed on classification documents, plaintiff has not provided any evidence that his race was

21  intentionally mislabeled for the purpose of discriminating against him.

22      **D.**   **Retaliation**

23        As defendants correctly note, plaintiff makes a passing reference in the amended

24  complaint to alleged retaliation, but does not include any supporting factual allegations.   In order

25  to state a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must establish that he was

26  retaliated against for exercising a constitutional right, and that the retaliatory action was not

1    related to a legitimate penological purpose, such as preserving institutional security.  See Barnett

2    v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).  In meeting this standard, the

3    prisoner must demonstrate a specific link between the alleged retaliation and the exercise of a

4    constitutional right.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Valandingham v.

5    Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner must also show that the

6    exercise of First Amendment rights was chilled, though not necessarily silenced, by the alleged

7    retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000), see also Rhodes v.

8    Robinson, 408 F.3d 559, 569 (9th Cir. 2005).  Thus, the prisoner plaintiff must establish the

9    following in order to state a claim for retaliation: (1) prison officials took adverse action against

10   the inmate; (2) the adverse action was taken because the inmate engaged in protected conduct;

11   (3) the adverse action chilled the inmate's First Amendment rights; and (4) the adverse action did

12   not serve a legitimate penological purpose.  See Rhodes, 408 F.3d at 568.

13          In this case, plaintiff cannot even state a retaliation claim because he has not

14   alleged any adverse action.

15          **E.    State Law Claims**

16          Defendants are correct that plaintiff's state law claims are barred.  The undisputed

17   evidence shows that plaintiff failed to exhaust state administrative remedies by filing a timely

18   tort claim with the state government.  Because plaintiff failed to do so, defendants are entitled to

19   summary judgment in all of plaintiff's state law claims.  See Ellis v. City of San Diego, 176 F.3d

20   1183, 1190 (9th Cir. 1999).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 112) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED:  February 7, 2014

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

14